**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **REBECA J.,** [1] ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **No. 20 C 3167** |
| **v.** ) | |
| ) | **Magistrate Judge Gabriel A. Fuentes** |
| **KILOLO KIJAKAZI, Acting** ) | |
| **Commissioner of Social Security,** [2] ) | |
| ) | |
| **Defendant.** ) | |

**MEMORANDUM OPINION AND ORDER** [3]

Before the Court is Plaintiff Rebeca J.'s motion seeking remand of the Administrative Law

Judge's ("ALJ") opinion denying her application for supplemental security income ("SSI")

benefits (D.E. 20) and the Commissioner's cross motion to affirm that decision. (D.E. 26). [4]

Plaintiff filed her claim for benefits on November 17, 2017, alleging she has been disabled due to

severe depression, hypothyroidism and a mood disorder since January 1, 2003. (R. 172, 189.)

**I.    Medical Record**

Although Plaintiff alleged in her application for benefits that she became disabled on

January 1, 2003, the medical record does not begin until 2017.

---

[1] Plaintiff's surname has been omitted from this opinion in compliance with the Court's Internal Operating Procedure No. 22.

[2] The Court substitutes Kilolo Kijakazi for her predecessor, Andrew Saul, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[3] On June 8, 2020, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was reassigned to this Court for all proceedings, including entry of final judgment. (D.E. 11.)

[4] The Appeals Council ("AC") subsequently denied review of the opinion (R. 1), making the ALJ's decision the final decision of the Commissioner. *Butler v. Kijakazi*, 4 F.4th 498, 500 (7th Cir. 2021).

A.     **Medical History**

Plaintiff primarily speaks Spanish, although she is able to communicate somewhat in English. (R. 37.)  On January 5, 2017, Plaintiff visited a primary care clinic for treatment of kidney disease, anxiety and prediabetes. (R. 293.)  On examination she was alert and oriented and had normal behavior, mood and affect; she was also noted to be morbidly obese, which continued to be documented at most subsequent medical examinations. (R. 295, 371, 466, 473.)  Plaintiff was prescribed Xanax for her anxiety and vitamin D.  (R. 293.)  At a follow-up appointment on January 16, Plaintiff had a normal psychiatric examination and reported that she had an upcoming appointment with a kidney specialist. (R. 297.)   Three weeks later at an initial psychiatric assessment due to complaints of anxiety, Plaintiff reported that she had last thought about suicide in 2000 and that she now had a good support system and did not think about suicide anymore. (R. 299.)  On examination, Plaintiff was agitated and restless and had a tendency towards tangential thoughts; she was assessed as having a depressed mood and labile affect (inappropriate laughter or crying), but was oriented to person, place and time (oriented x3) and denied delusions. (*Id.*)  She reported having been previously diagnosed with bi-polar disorder but that she had only received mental health therapy during past (pre-2000) hospitalizations for suicide attempts. (R. 300.) Treatment records also noted a previous history of alcohol abuse (2005), but Plaintiff reported no problems with alcohol in the past three to four years. (*Id.*)

On February 16, and 27, 2017, Plaintiff underwent a two-part psychiatric assessment. (R. 302.)  Her mood, affect, attention/concentration and grooming were normal at both appointments, but at the February 16 assessment, the examiner documented she had tangential thoughts that lengthened her appointment due to her verbosity. (*Id.*)  She reported sleeping well and that she was trying to improve her physical health by walking; she had no current pain complaints. (R. 304.)

The social worker who conducted Plaintiff's assessment assessed her as having a mood disorder and anxiety. (*Id.*)

At an appointment on March 15, 2017, to refill her Xanax, Plaintiff reported doing well and presented with a normal mood and affect as well as normal behavior and judgment. (R 308.) After meeting with a social worker the following day, Plaintiff was diagnosed as bi-polar and with PTSD and referred to psychiatry and counseling. (R. 313.) On March 22 she had a normal psychiatric examination with a nurse practitioner; she reported during her appointment that she had not been taking her cholesterol medication and had an appointment with her kidney specialist. (R. 314.) At an appointment with her social worker on April 5, Plaintiff had a normal affect but anxious mood and reported feeling depressed but that she tried to address her depression by going out, taking walks, and speaking to friends. (R. 316.) On April 21, Plaintiff had a normal psychiatric screen at a medical appointment for an acute gastrointestinal issue. (R. 324.) She reported built up anger and resentment towards her mother at an appointment with her social worker on April 24 and said she continued to try to relax by gardening, walking and talking to friends. (235.)

Plaintiff continued to have normal psychiatric screens in June and September 2017 as part of medical appointments with various clinic doctors and nurse practitioners to treat her high cholesterol, vitamin D deficiency, thyroid issues and kidney disease; she continued to take Xanax for anxiety and medication for her cholesterol and thyroid. (R. 333, 334.) At a September 2017 visit to her social worker, Plaintiff reported feeling better in recent months. (R. 335.) She was counseled to continue exercising and working on healthy lifestyle choices. (R. 343.) In October she requested a refill of her Xanax and reported feeling depressed and tearful. (R. 345.)

On November 17, 2017, Plaintiff completed her application for benefits in which she reported that she worked as a babysitter. (R. 173.)[5]  On her application Plaintiff wrote both that the heaviest weight lifted was 20 pounds and also that she frequently carried 25 pounds as a babysitter. (R. 191.)  Also in November 2017, at an appointment to refill her prescription for Xanax, Plaintiff requested a referral to a psychiatrist due to increased nervousness and feelings of depression. (R. 349.)  On December 19, 2017, Plaintiff completed a function report in which she wrote that she had difficulty grabbing objects and often drops them, and that she had constant abdominal pain due to kidney disease. (R. 219.)  She reported being able to perform "small chores" around the house and help her neighbors with childcare sometimes, which included picking them up from the bus and making them lunch. (R. 220, 229.)  Plaintiff also stated that her boyfriend helped her prepare her medications and reminded her to take them.  With respect to her activities of daily living, ("ADLs"), Plaintiff wrote that she could prepare frozen meals, dust, do laundry, and clean counters, and that each of these tasks took her five to 10 minutes to complete. (R. 221.)  Plaintiff does not drive but was able to go out several times per week to shop for food and personal items, and reported being able to go out alone, pay bills, count change, handle a savings account and use a checkbook. (R. 222.)  Plaintiff's hobbies included reading, puzzles, watching television, sitting with her family, and taking short walks. (R. 223.)  She reported that her pain prevents her from socializing and doing daily activities at her previous levels. (R. 224.)  In her function report, Plaintiff also stated that she was able to lift 20 to 40 pounds, she could walk one block before needing to rest, and that she was able to pay attention for five-to-ten minutes and had trouble reading and understanding things. (*Id.*)  When asked about unusual behaviors or fears she wrote "rambling and nervousness. Fear of person injury." (R. 225.)

---

[5] Plaintiff's application date is variously recorded in documentation from the Administration as October 5, 2017, and November 17, 2017.  For our purposes, the difference in dates is irrelevant.

In December 2017, bloodwork indicated poor thyroid function; Plaintiff complained about pain in her kidneys. (R. 366.) Her Synthroid was increased, and she was referred for a urinary analysis. (R. 366-67.) At an appointment in January 2018, Plaintiff's thyroid medication was adjusted and she was again counseled to begin a daily exercise program and follow a healthy diet. (R. 371.) On February 17, 2018, Plaintiff underwent an internal medicine consultative examination in connection with her application for benefits. (R. 392.) Joseph Youkhana, M.D. assessed Plaintiff as obese, oriented x3, in no distress, and adequately dressed and groomed. (R. 393.) She had a "waddling gait" with decreased range of motion in her back, was unable to heel-toe walk, had moderate difficulty squatting and mild difficulty getting on and off the exam table and tandem walking. (*Id.,* 395.) An X-ray of her back taken that day revealed mostly normal results with "minimal multilevel vertebral spurring." (R. 400.) On the same day, Plaintiff also underwent a psychiatric consultative examination. (R. 403.) Angeles Rodriguez, M.D., assessed Plaintiff as poorly groomed – disheveled with dirty clothes – and difficult to interview because she was crying and "having childish behavior." (*Id.*) At the examination, Plaintiff reported sometimes having auditory hallucinations and was unable to give the current date, her birthday, or recall three words after five minutes. She could not perform simple calculations, could not interpret three Spanish proverbs appropriately, and gave no response when asked about similarities and differences. (R. 406.) Dr. Rodriguez did not give Plaintiff a definitive diagnosis, but suspected schizoaffective disorder, possible bipolar type II, and mild neurocognitive disorder. (R. 407.)

Plaintiff had an annual examination on March 28, 2018. (R. 380.) Treatment notes from this exam reflect complaints of knee pain for the previous several months and that Plaintiff reported it was "aggravated by standing for long periods and walking." (R. 380.) Plaintiff was taking medication for her thyroid, high blood pressure, heartburn, and high cholesterol, as well as Xanax

for anxiety and ibuprofen temporarily for pain. (R. 380-81.) On examination, her psychiatric review was normal, as were all of her other systems other than decreased range of motion, swelling, and tenderness in her left knee. (*Id.*) She was advised to begin a daily aerobic exercise program and continue to attempt to lose weight through healthy lifestyle choices. (R. 382.) At a follow-up appointment on April 9, plaintiff was diagnosed with primary osteoarthritis of the left knee; all other systems including her psychiatric screen were normal. (R. 384.) She was instructed to use heat and over-the-counter Tylenol, and to follow up with orthopedics for further treatment. (*Id.*)

In August 2018, Plaintiff's primary doctor referred her to a cardiologist for tachycardia, or rapid heart rate. (R. 504.) At her examination Plaintiff reported heart palpitations and chest pain, especially when lifting something or walking. (*Id.*) On examination, her various physical systems – including respiratory and cardiac – were normal. (R. 498, 502.) She had an echocardiogram in December 2018 which was essentially normal. (R. 428-30.)[6]

The record contains several medical opinions, although none from any medical provider who treated Plaintiff. On March 7, 2018, Agency doctor Donald Henson, PhD, reviewed the notes from Plaintiff's mental status consultative examination and opined that Plaintiff had mild limitations in her ability to remember or apply information and moderate limitations in her ability to interact with others, concentrate, persist, or maintain pace, and adapt or manage herself. (R. 55.) Dr. Henson found Plaintiff partially credible because of her history of depression and anxiety and

---

[6] Plaintiff characterizes the results of her echocardiogram as indicating shortness of breath when actually, the "indications" section refers to reasons a particular medical test is ordered and does not refer to results. Indications | definition of Indications by Medical dictionary (thefreedictionary.com), last visited on 3/29/23. Moreover, while Plaintiff states that cardiologist Mikaela Stancu "diagnosed" her with heart palpitations, in fact the treatment note at issue only states that Plaintiff is "positive" for chest pain and palpitations under the "review of systems" section, which is Plaintiff's description of her medical history and not a diagnosis. Review of Systems - American College of Cardiology (acc.org), last visited on 3/29/23. On physical examination, Plaintiff's cardiac examination was negative for palpitations and her heart sounds were normal; Dr. Stancu wrote that Plaintiff's complaint of DOE (dyspnea on exertion) had "very unclear description and limited history," and thus she was ordering an echocardiogram and stress test based on Plaintiff's history of shortness of breath and chest pains. (R. 505-06.) It was this echocardiogram that was essentially normal.

substance abuse but opined that her presentation during her examination was much more severe than suggested by the medical records, and that her functional abilities were primarily limited by her physical condition. (*Id.*)  Dr. Henson also completed an RFC which included a narrative explanation which stated that while Plaintiff would have "problems satisfactorily performing detailed activities of a somewhat complicated nature, she performs a fair array of chores and leisure activities, works with children part-time, and possesses sufficient cognitive and attentional abilities to perform simple routine activities in a relatively low stress environment which are within the limits of her physical capabilities and has limited involvement with the general public.  Capable of performing one/two step activities." (R. 61.)[7]  On reconsideration, Linda Lanier, Ph.D., affirmed Dr. Henson's opinion, noting that at an examination with her treating doctor in February 2017 Plaintiff did have tangential thoughts, but the rest of her mental status examination was normal, and Dr. Lanier found that there were "huge inconsistencies" at the February 2018 examination. (R. 68-70.)

On March 12, 2018, Agency doctor Victoria Dow, M.D., opined that Plaintiff's statements about her physical limitations were not entirely credible due to her ability to perform activities of daily living ("ADLs"). (R.56.)  Dr. Dow discounted Plaintiff's stated difficulty sitting because of the lack of medical records reporting such a limitation. (*Id.*)  She assessed Plaintiff as having an RFC for light work, including being able to occasionally lift up to 20 pounds and frequently lift

---

[7] The RFC form Dr. Henson completed also contained more than 20 "checkbox" questions that were to be used to "help determine the individual's ability to perform sustained work activities." (R. 59.)  These questions asked the doctor to rate Plaintiff's "Paragraph B" limitations in a number of functional areas, for example, "the ability to understand and remember very short and simple instructions," which Dr. Henson assessed Plaintiff as being "not significantly limited," and the "ability to maintain attention and concentration for extended periods," which Dr. Henson assessed Plaintiff as being "moderately limited." When asked to provide a narrative explanation for any particular determination that Plaintiff was or was not limited in a specific area, Dr. Henson referred to the single narrative paragraph described above. (R 59-60.) The RFC form specifically stated that "the actual mental residual functional capacity is recorded in the narrative discussion(s), which describes how the evidence supports the conclusions." (R. 59.)

up to 10 pounds, stand, sit, or walk for up to six hours in an eight-hour workday, and having additional postural limitations of frequent climbing steps and ramps, stooping, crouching and crawling and occasional climbing of ladders due to Plaintiff's BMI of 47.9, waddling gait, and reduced range of motion in her lumbar spine. (R. 56-57.) Richard Lee Smith, M.D., affirmed this opinion on reconsideration, agreeing that Plaintiff could perform work at the light level. (R. 69, 74.)

### B. Hearing

At the hearing, Plaintiff testified through a translator that she could stand for 15 to 20 minutes at one time and walk about 80 steps. (R. 40.) She said that she had trouble keeping jobs because she had trouble getting along with people and also because of pain in her knees. (R. 45.) The ALJ gave the vocational expert ("VE") a hypothetical that matched the RFC he eventually assigned. The VE identified three jobs Plaintiff could do: housekeeper, DOT number 323.687-024, with approximately 400,000 jobs in the national economy, a sorter, DOT number 222.687-022, with 40,000 jobs in the national economy, and a packer, DOT number 784.687-042, with 30,000 in the national economy. (R. 46.) On questioning by Plaintiff's attorney, the VE clarified that if an individual cannot stand for more than 15 to 20 minutes at a time before needing to rest for 10 minutes after, they would not be able to do any light work, and that if an individual needed frequent supervision to stay on task, he or she would not be able to maintain competitive employment. (R. 47.)

### C. ALJ Opinion

After analyzing the five-step process for determining disability, 20 C.F.R. § 416.920(a), the ALJ found that Plaintiff had the severe impairments of obesity, minimal vertebral spurring in the lumbar spine, left knee osteoarthritis, bipolar disorder, anxiety, depression, and alcohol abuse

disorder, and the non-severe impairments of hypertension, hypothyroidism and chronic kidney disease. (R. 23.) He next determined at Step Three that none of Plaintiff's impairments met a Listing. (R. 24.) As relevant to our analysis, the ALJ specifically noted that while Plaintiff is classified as obese, her obesity did not meet the requirements for any listing, and she retained the ability to ambulate effectively. (*Id.*)

The ALJ then considered the Paragraph B criteria for assessing Plaintiff's mental impairments. Specifically, the ALJ found that Plaintiff had a mild limitation in understanding, remembering, and applying information, mentioning the limitations she reported in her function report, her complaints of depression and anxiety, the several mental status examinations that documented tangential thoughts as well as her abnormal consultative examination, and then comparing that to her ability to pay bills, count change and handle a checkbook, her many normal mental status examinations, and her enjoyment of reading and puzzles. (R. 24-25.) The ALJ found Plaintiff to have moderate limitations in her ability to interact with others because she was crying and difficult to interview at her consultative examination and occasionally reported irritability, but she was able to go out alone to shop in stores and reported getting along well with family, friends, and authority figures. (*Id.*) With respect to Plaintiff's ability to concentrate, persist or maintain pace, the ALJ found Plaintiff to have moderate limitations because at her consultative examination she could add but not multiply or perform serial 3s or 7s and she wrote in her function report that she could pay attention for only five to 10 minutes. (*Id.*) However, the ALJ noted that the function reports were not consistent with the majority of the medical evidence that documented normal mood, affect, concentration, behavior, judgment and thought content. (*Id.*) Finally, the ALJ found that Plaintiff had moderate limitations in her ability to manage oneself, comparing statements she made in her function report and her abnormal 2018 consultative examination with her many normal

mental status examinations, no other documentations of poor personal hygiene, and Plaintiff's own testimony that she does not have trouble with personal care and sometimes takes care of a neighbor's children. (*Id.*)

The ALJ assigned Plaintiff an RFC for light work, except that she can occasionally balance, stoop, kneel, crouch, crawl, and climb ladders, ropes, scaffolds, ramps, and stairs. She cannot work around hazards such as unprotected heights and exposed moving mechanical parts. She can understand, remember, and carry out short, simple work instructions and can sustain concentration to perform simple, routine tasks. She should not have to interact with the public and needs to work in a low-pressure and low-stress work environment defined as one requiring only occasional and simple work-related decision-making, occasional changes in the work setting, and no work at a production-rate pace, such as assembly line work or other work requiring rigid quotas. (R. 26.)

The ALJ acknowledged Plaintiff's allegations from her function report and testimony that she has difficulty grabbing objects and that she drops things, as well as trouble bending, squatting, and standing and can only walk for a block before needing to rest. He noted that she testified to needing reminders to take care of personal needs, such as to take medicine, can only pay attention for five-ten minutes, and does not finish what she starts. (R. 26-27.) However, the ALJ also noted that Plaintiff had no trouble with personal care, sometimes watches her neighbor's children, performs household chores such as dusting, laundry, and cleaning counters, goes out by herself, shops in stores alone, and can pay bills, count change, use a checkbook, and handle a savings account. (R. 27.) He also acknowledged Plaintiff's statements that she enjoys reading, puzzles, spending time with family and walking in the park, and does not have trouble getting along with family, friends, or others, including authority figures, and that she wrote in her function report that she can lift 20 to 40 pounds. (*Id.*)

10

The ALJ determined that Plaintiff's allegations that her impairments prevented her from working at all were not entirely credible when compared to the medical evidence. Specifically, the ALJ noted that Plaintiff frequently complained of depression and anxiety and managed her symptoms with Xanax, and that two mental status examinations in February and March 2017 documented agitated behavior and speech, tangential thoughts, difficulty staying on track, and a depressed mood, but simultaneously noted that Plaintiff had good concentration, attention, and memory, and a neat and appropriate appearance. (R. 27.) The ALJ then highlighted Plaintiff's psychological consultative examination from February 2018, describing Plaintiff's symptoms as appearing "much more severe," and noting that she reported auditory hallucinations, an euthymic (tranquil) mood, tearful affect, and normal psychomotor activity. (*Id.*) At this examination, acknowledged the ALJ, Plaintiff was difficult to interview, crying, and presented with a disheveled appearance and childish behavior. (*Id.*) However, the ALJ then noted that this particular examination finding was not consistent with the majority of Plaintiff's mental status evaluations after her alleged onset date, which documented normal mood, affect, behavior, judgment, and thought content and never documented complaints of auditory hallucination or poor personal hygiene.[8] (*Id.*) Finally, the ALJ noted that Plaintiff had stopped taking her psychiatric medications in December 2018 because they made her feel "stiff," and therefore, all the Plaintiff's treatment records as a whole support the mental limitations in the RFC but not the severity of Plaintiff's allegations. (*Id.*)

With respect to Plaintiff's physical impairments, the ALJ stated that they imposed some functional limitations but were not as severe as she alleged. (R. 27.) Specifically, he acknowledged

---

[8] The ALJ uses the phrase "alleged onset date" but it is likely he meant Plaintiff's filing date, which he references several other times, such as when he discussed Plaintiff's February 2017 mental status examinations. Moreover, while the ALJ states that Plaintiff's filing date is October 5, 2017, her applications documents completed by the Administration state that it is November 17, 2017.

all of the treatment notes that Plaintiff had a BMI that qualified her as obese but noted that Plaintiff also reported working in her garden and talking walks as a means to try to lose weight. (R. 28.) He recognized that her February 2018 consultative examination reflected more severe symptoms including a waddling gait, decreased range of motion in her back and difficulty squatting, tandem walking, and getting on and off the exam table, but that a lumbar x-ray taken that day showed minimal multi-level vertebral spurring and the examiner diagnosed her with obesity and well-controlled hypertension and hypothyroidism. (*Id.*) Next, the ALJ acknowledged that Plaintiff first complained of knee pain in March 2018 and noted that X-rays from that time showed mild osteoarthritis in her left knee but that she denied joint pain in later examinations in August, September, and December 2018. (*Id.*)

The ALJ gave the opinions of the two Agency doctors who opined on Plaintiff's physical RFC some weight because they accounted for Plaintiff's obesity, back, and knee issues, but then further reduced the postural limitation in her RFC from frequent to occasional "out of an abundance of caution." (R. 28.) The ALJ accepted as persuasive the opinions of the two Agency doctors who opined on Plaintiff's mental health that she had mild limitations in her ability to understand, remember and apply information and moderate limitations in the other three Paragraph B factors. (R. 28-29.) Specifically, the ALJ noted that the doctors opined that Plaintiff possessed sufficient cognitive and attentional abilities to perform simple, routine, activities in a relatively low stress environment with limited involvement with the public. (R. 29.) In so finding, the ALJ mentioned Plaintiff's treatment records, which documented tangential thoughts and abnormal consultative examination findings, but generally normal mental status examinations and "very little mental health treatment." (*Id.*)

12

After determining that Plaintiff had no past relevant work and could not communicate in English, the ALJ determined that, based on the testimony of the VE, Plaintiff could work as a hotel housekeeper, DOT number 323.687-024, with approximately 400,000 jobs in the national economy, a sorter, DOT number 222.687-022, with 40,000 jobs in the national economy, and a packer, DOT number 784.687-042, with 30,000 in the national economy. (R. 30.)

## II.    Analysis

An ALJ's decision will be affirmed if it is supported by "substantial evidence," which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, – U.S. –, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id*. The Court "will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination. Rather, this court asks whether the ALJ's decision reflects an adequate logical bridge from the evidence to the conclusions." *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022) (citations and quotations omitted).  The claimant has the burden of proof at steps one through four of the five-step sequential process for determining disability. *See Mandrell v. Kijakazi*, 25 F.4th 514, 516 (7th Cir. 2022).  At step five, the burden of proof shifts to the Commissioner of Social Security to show that the claimant can adjust to other work existing in "a significant number of jobs…in the national economy."  *See Brace v. Saul*, 970 F.3d 818, 820 (7th Cir. 2020).

Plaintiff argues for remand on the grounds that the ALJ improperly formulated her RFC and improperly evaluated her credibility. (Pl. Mem. in Support of Remand at 6, 12.)  Because we find that the ALJ supported his RFC determination and credibility determination with substantial evidence, we affirm the decision.

13

A.      **The ALJ Supported Plaintiff's Physical RFC with Substantial Evidence.**

Plaintiff first argues that the ALJ failed to adequately account for her obesity in the RFC assessment and also erred by not specifically describing her limitations in standing, walking, or lifting.  Although Plaintiff acknowledges that the ALJ discusses Plaintiff's obesity throughout the opinion, she argues that he failed to explain how her obesity may have exacerbated her other physical impairments, including her knee arthritis, heart palpitations, and shortness of breath. (Pl. Mem. at 8).

Plaintiff's argument is misplaced. The Seventh Circuit has held, "while obesity is no longer a standalone disabling impairment, the ALJ must still consider its impact when evaluating the severity of other impairments." *Brown v. Colvin*, 845 F.3d 247, 251 (7th Cir. 2016) (citing *Castile v. Astrue*, 617 F.3d 923, 928 (7th Cir. 2010)).  The Appeals Court went on to explain that "we recognize that the combined effect(s) of obesity with other impairments may be worse than those same impairments without the addition of obesity." *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011) ("It is one thing to have a bad knee; it is another thing to have a bad knee supporting a body mass index in excess of 40.")

In this case, we find that the ALJ supported with substantial evidence his consideration of Plaintiff's obesity and how it impacts the RFC determination. Specifically, the ALJ described Plaintiff's BMI and referenced SSR 02-1p, the Social Security Administration's guidance on obesity.[9]  The ALJ noted that Plaintiff's obesity was mentioned in nearly all of her medical records and described her obesity as a severe impairment. In discussing the effects of Plaintiff's obesity, the ALJ explained that Plaintiff could ambulate effectively and that there was no other

---

[9] SSR 02-1p was rescinded and replaced by SSR19-2p on May 20, 2019, about three weeks after the ALJ's opinion.  Therefore, we will analyze his determination using the prior standard.

evidence that Plaintiff's obesity caused any listing-level severity. Also with respect to Plaintiff's weight, the ALJ noted that despite a BMI consistently in the 40s, Plaintiff was able to work in her garden, take walks to relax, and was trying to lose weight. Importantly, the ALJ discussed that the severity of Plaintiff's physical impairments could be exacerbated by her obesity, including her complaints of knee pain with swelling and tenderness, her X-ray results showing mild osteoarthritis, problems walking and squatting during her consultative examination, and her decreased range of motion in her back, as well as the consultative examiner's diagnosis that Plaintiff was obese. The ALJ contrasted this evidence with the evidence that Plaintiff did not complain about joint pain in August, September, or December 2018 and that even at the more severe showing at her consultative examination in February 2018, she had 5/5 motor strength and no evidence of lumbar root compression or peripheral neuropathy. (R. 28.) Furthermore, the ALJ specifically accepted the only two medical opinions in the record, which diagnosed Plaintiff with obesity but found that she still retained the ability to work at the light level.[10] *Pepper v. Colvin,* 712 F.3d 351, 364-65 (7th Cir. 2013).

Moreover, in addition to the evidence the ALJ considered, we also note that Plaintiff does not offer any evidence as to how her obesity affects her ability to work but only suggests that the. ALJ should have found her more limited because she is obese. But a claimant's challenge to the ALJ's assessment of her obesity fails where the claimant "does not identify any evidence in the record that suggests greater limitations from her obesity than those identified by the ALJ." *Shumaker v. Colvin*, 632 F. App'x 861, 867 (7th Cir. 2015) (holding that claimant must "explain how her obesity exacerbated her underlying impairments," *cited in, Marcine H. v. Kijakazi,* No. 22 C 730, 2023 WL 2631624, at *4 (N.D. Ill. Mar. 24, 2023). Here, the ALJ

---

[10] We recognize that the ALJ did not discuss Plaintiff's cardiac issues, but as we explained above, Plaintiff's testing and examinations were essentially normal.

addressed all of the evidence of Plaintiff's impairments and their severity through the lens of her obesity and therefore, we find that the ALJ's consideration of Plaintiff's obesity was supported by substantial evidence and Plaintiff's objections amount to little more than a disagreement about how the ALJ weighed that evidence, which we will not overturn. *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021).

With respect to Plaintiff's allegation that the ALJ did not adequately describe her limitations in walking, standing and carrying to the VE, that is incorrect. As we explained above in connection with his consideration of Plaintiff's obesity, the ALJ provided substantial evidence to support his RFC determination, and he accepted the opinions of the two Agency physicians who opined that Plaintiff was able to perform work at the light level despite her obesity, which per the regulations means that an individual can carry ten pounds frequently and up to 20 pounds occasionally, sit for up to six hours in an eight-hour workday, and stand or walk for up to six hours in and eight-hour workday. 20 CFR § 416.967(b). While Plaintiff argues that the ALJ should have provided greater limitations to the VE, her argument amounts to nothing more than a disagreement with how the ALJ weighed the evidence.[11] And the ALJ went further with respect to Plaintiff's postural limitations and reduced her requirements for stooping, kneeling, crouching, crawling, and balancing from frequently to occasionally. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (RFC that is more restrictive than state agency opinion indicates reasoned consideration of the evidence.) It is the ALJ's duty to weigh the evidence. We find that he did, and that Plaintiff's physical RFC determination is supported by substantial evidence. We will not reweigh that evidence.

---

[11] Plaintiff points to her testimony that she was only able to stand for 15 to 20 minutes at one time and hold no more than a bag of rice, but she does not dispute evidence in her function report, application for benefits, and treatment notes that she could lift up to 40 pounds, carried children weighing 25 pounds, and walked for exercise, abilities that match – and even exceed – the requirements of light work.

### B.    The ALJ Supported Plaintiff's Mental RFC with Substantial Evidence.

Plaintiff contends that the ALJ made two separate errors with respect to the mental health portion of her RFC.  First, she points to the opinion of the agency doctors that she is capable of working at jobs that require no more than one-two step tasks and argues that the ALJ's failure to include this limitation in his RFC is grounds for remand, particularly because two of the three jobs identified by the VE (the sorter and packer jobs) involve reasoning level two, which a number of courts have found precludes jobs with one-to-two step limitations. (Pl. Mem. in Support at 10). Second, she contends that the RFC did not adequately accommodate the opinions' findings that she is moderately limited in both concentration, persistence, and pace and in managing oneself. (Pl. Mem. in Support at 11-12).   After reviewing both of her arguments, we find that the ALJ's mental RFC is supported by substantial evidence.

*First,* we find that the ALJ's failure to include a one-to-two step limitation in the RFC is, at most, harmless error.  The ALJ found persuasive the only medical opinions in the record, which held that Plaintiff could perform simple, routine activities in a relatively low stress environment with limited involvement with the general public and included those limitations in the RFC.  And while the ALJ did not include the statement that Plaintiff was "capable of performing 1-2 step tasks," in the RFC, Plaintiff acknowledges that the Seventh Circuit has not definitively held that a limitation to one-to-two step jobs disqualifies a claimant from positions involving reasoning level two, although it has recognized other courts that have done so. *See Surprise v. Saul,* 968 F.3d 658, 662-63 (7th Cir. 2020) (citing cases).  But even accepting Plaintiff's argument that the sorter and packer positions would have been disqualified by a limitation to one-two step jobs because they are reasoning level two, that still leaves 400,000 hotel housekeeping positions available at reasoning level of one.   Plaintiff did not challenge the VE's job number estimations at the hearing

17

and has thus waived the right to challenge now. *Fetting v. Kijakazi*, — F.4th —, No. 22-1901, 2023 WL 2420881 at *2 (7th Cir. March 9, 2023). And while Plaintiff now argues that the number of hotel housekeeper jobs may not be "substantial" because it represents a national and not local estimate, in addition to her having waived this argument by failing to ask questions about the VE's job numbers at the hearing, the Seventh Circuit has separately commented that 30,000 jobs, 55,000 jobs, and 89,000 jobs in the national economy was significant. *Kuhn v. Kijakazi*, 2022 WL 17546947, at *3 (7th Cir. 2022); *Mitchell v. Kijakazi*, 2021 WL 3086194, at *3 (7th Cir. 2021); *Collins v. Berryhill*, 743 F. App'x 21, 25-26 (7th Cir. 2018).

"In assessing whether an error is harmless, [a court] examine[s] the record to determine whether [it] can predict with great confidence what the result of remand will be." *Butler v. Kijakazi*, 4 F.4th 498, 504 (7th Cir. 2021). In this case, because a substantial number of jobs (as hotel housekeeper) would be available even with a one-two step limitation, any error resulting from the ALJ's omission of a one-two step limitation from the RFC to be harmless.

Next, we find that Plaintiff's additional arguments concerning the mental health portion of the RFC to be without merit. Plaintiff argues that the RFC does not adequately account for her moderate limitations in concentration, persistence and pace and managing oneself because the hypothetical the ALJ gave the VE (and thus the ALJ's ultimate RFC) did not account for the medical opinion's "check boxes" opining that Plaintiff had moderate limitations in such things as performing activities within a schedule, being punctual and completing a normal workday without interruption from psychologically based symptoms. (Pl. Mem. at 11, citing *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019)). In *Crump*, the Seventh Circuit found that an RFC that limited the claimant to simple, routine, and repetitive tasks with few workplace changes was not enough to address the claimant's limitations in concentration. But in that case, the ALJ rejected the more

18

restrictive opinion of the plaintiff's treating doctor regarding her limitations in concentration, persistence, and pace and crafted his own hypothetical and RFC without reference to the evidence. 932 F. 3d at 571.  In contrast, the ALJ here accepted the record's only mental health opinions and then crafted an RFC from them, including specific mention of her ability to sustain concentration. *See Recha v. Saul*, 843 Fed.Appx. 1, 4 (7th Cir. 2021) ("[A]n ALJ has some latitude with the exact wording of an RFC as long as it conveys in some way the restrictions necessary to address a claimant's limitations.").  Here, Plaintiff does not offer any evidence that the check-box assessment that she has "moderate" limitations in such abilities as performing activities within a schedule, completing a normal workday without interruption from psychologically-based symptoms, or performing at a consistent pace without an unreasonable number and length of rest periods  is not accounted for the narrative portion of the medical opinions that she possesses "sufficient cognitive and attentional abilities to perform simple, routine activities in a relatively low stress environment."

And as Defendant points out, recent caselaw from the Seventh Circuit has clarified that while information in the checkboxes cannot be ignored, they are "perhaps less useful" than the narrative section of a psychologist's opinion. *Varga v. Colvin*, 794 F.3d 809, 816 (7th Cir. 2015). Plaintiff's argument that her testimony about her limitations warrants greater consideration in the RFC is merely her disagreement with the way the ALJ weighed the evidence.[12]  Claimant may disagree with the ALJ's conclusion, but the "RFC is a legal – and not a medical – decision that is

---

[12] For example, Plaintiff argues that she had difficulty completing tasks and could only pay attention for five to ten minutes, and that these limitations warranted greater consideration in the RFC.  But the ALJ acknowledged these allegations of Plaintiff and in his Paragraph B determination and balanced them against the other medical evidence in the record - including the medical opinion and found this testimony not credible.

exclusively within the ALJ's authority to make[.]" *Michael B. v. Berryhill*, 2019 WL 2269962, at *6 (N.D. Ill. 2019). The ALJ did not err in his RFC decision here.

### C. The ALJ's Credibility Analysis Was Not Patently Wrong

Briefly, Plaintiff's argument that the ALJ did not support his credibility determination with substantial evidence is also without merit. While Plaintiff appears to argue that the ALJ "cherry picked" the evidence to support his conclusion that Plaintiff is not disabled, we disagree. Although ALJs do not need to address every piece of evidence in the record, an ALJ may not ignore an entire line of evidence contrary to its ruling. *Reinaas v. Saul*, 953 F.3d 461, 467 (7th Cir. 2020). As long as an ALJ gives specific reasons supported by the record, we will not overturn a credibility determination unless it is patently wrong. *Grotts v. Kijakazi*, 27 F.4th 1273, 1278-79 (7th Cir. 2022). In this case, as described above, the ALJ acknowledged Plaintiff's complaints of depression and anxiety, described all of her medical examinations that documented more severe behaviors or symptoms, and discussed her limited treatment of her mental health symptoms and then compared this evidence to those parts of the record that supported a finding that Plaintiff's mental impairments were less severe, such as a number of normal mental status evaluations, her daily activities, and her reports of improved mental health at certain examinations. We find no error in the ALJ's consideration of Plaintiff's credibility and find that his assessment is supported by substantial evidence.

## CONCLUSION

For these reasons, the Court grants Defendant's motion to affirm the decision of the ALJ (D.E. 26) and denies Plaintiff's motion to remand.  (D.E. 20.)


ENTER:


_____
**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**DATED: April 11, 2023**